Statement of the Case.
MONROE, C. J.
Plaintiffs, as children and heirs of Morris Levy, bring this suit for the recovery of 49.97 acres of land, forming part, as they allege, of the “Norris” tract,, of 640 acres, acquired by their father, August 8, 1863, by purchase from E. K. Hall and wife, and of which they allege that William and Edmund Capliss and the heirs of Charles Capliss, herein made defendants, are unlawfully in possession; the land so claimed being described as:
“Beginning at the southeast corner of lot No. 15, of sec. 10, or the intersection of the line between sees. 10 and 15, with .the west or back line of the Levy plantation, at a point marked ‘X’ on said map” (referring to the map annexed to the petition) “and run thence east a distance of 2110 feet to a point marked ‘Z’; thence south 52 degrees 30' east, to the intersection of the Levy plantation with the line between lots 2 and 6 of section 4, or a point *551 marked ‘B’; thence west to the west or back line of the Levy plantation, or point ‘W’; thence, along back line of Levy plantation to point ‘X,’ place of beginning.”
Defendants deny that they are in possession of any land belonging to plaintiffs and allege that they are the owners and are in possession of fractional lots 16, of section 10, lot 1, of section 15, and lot 4 of section 14, in township IS north, range 13 west, parish of Oaddo, according to the map and plat of the “Daniels” lands, as made by H. Watts, surveyor, and duly recorded; and that they are informed and believe, and so charge the fact to be, that the lands described in plaintiff’s petition, and as shown on map of same, annexed to said petition, are a portion of said lots, so owned and possessed by plaintiffs. They further allege that William, Charles, and Edmund Capliss acquired said lots from A. II. 'Leonard; that Charles Capliss died, leaving defendants his sole heirs; that Leonard acquired the lots at a sale made under a writ of seizure and sale issued in the succession of J. R. J. Daniels in 1872; that the possession of the succession was vested in the purchaser, and that he and defendants have been in actual, undisturbed possession since that time, and for 15 years have had them under fence and partly in cultivation, the cost of making them fit for cultivation amounting to $25 an acre. They further allege that plaintiffs’ ancestor, Morris Levy, was present at the Daniels sale and bought lots 2 and 6 in seetion 14, and 15 in section 10, adjacent to the Norris tract, as shown by the “annexed” map, and that he and his assigns are bound by said map and es-topped to deny the boundaries as therein fixed.. They plc-ad the proscription of 10 and 30 years and call Leonard in warranty. Answering that call, Leonard alleges that the land in question was part of a large tract granted by the Caddo Indians to one Grappe, and reserved to him by a treaty entered into in 1835 between the Indians and the government of the United States; that Grappe sold the land so reserved to Jekiel Brooks, by whom a large portion of it was sold to Daniels and associates, and that Daniels acquired the interest of his associates, and the answer of Leonard is, in other respects, to the same effect as that of defendants.
The title to the Norris tract came before this court in 1843, in a petitory action (No. 263 of the district court), in which Brooks, as the transferee of the Grappes (of whom there were several), claimed the tract as against Norris, and the title of Norris was then vindicated and affirmed. Brooks v. Norris, 6 R. 175. In 1853. Brooks brought another suit (No. 356 of the'district court), alleging his acquisition of the land included in the grant to Grappe “except a tract, generally called the Norris tract, or Samuel Norris’ Rio Hondo claim, * * * surrounded on all sides by the lands of your petitioner except on side to the east, which is bounded by Red river,”' alleging the judgment in favor of Norris in the previous suit, and further alleging that the boundaries between said tract and his lands had never been determined, that E. IC Hall, J. M. Farmer, and R. G. Bagley were in possession of the tract, claiming as owners, and praying -that they be cited and that a survey be ordered; and thereafter, by consent, on December 29, 1853, an order was made directing Hailey Watts, parish surveyor, to make the survey commencing “at the lowest point on the river, indicated as part of Samuel Norris’ Rio Hondo claim, * * * and run a mile up the river, to the northward and back, for quantity of 640 acres in lines perpendicular to the front line on the river,” 'etc. The survey was accordingly made by Watts, who returned into court a plat and field notes thereof as follows, to wit:
“Hailey Watts map returned into court pursuant to order of Dec. 29, 1853, in Brooks *553 v. Norris (3561 of Dist. Court), to make survey of Norris tract * * * of 640 acres.

“In compliance with an order from the court * * * to me directed to make survey on Samuel Norris, Rio Hondo claim, I have surveyed 640 acres as follows: Commencing at a point on the west bank of Red river and Tuning up Red river to the northwest on traverse S. 84° W. 300; N. 70° W. 500; N. 60° W. 400; N. 53° W. 700; N. 42° W. 1000; N. 34° W. 600; N. 43° W. 14.00; N. 53° W. 13.00; N. 46° W. S00; N. 35° W. 600; N. 32.27 chains; thence N. 52%° E. 83.36 chains to the place of beginning, as represented by the preceding diagram.
“[Signed] H. Watts, Surveyor.
“The diagram within and extended to the right is the line claimed by Mr. Hall.
“[Signed] Hailey Watts.”
Thereafter, John R. J. Daniels instituted a suit against Brooks (8967 of the district court), obtained judgment, and issued execution, under which there were adjudicated to him, on June 6, 1857, 9,000 acres of land, more or less, being the remainder of the tract of 10,000 acres (after deducting such portions thereof as Brooks had disposed of, or subjected to incumbrance, or had been recovered from him by judgment) which Brooks had acquired from the Indians, etc., and had mortgaged to Daniels; and (probably in 1861) Daniels instituted suit (6129 of the district court) against Hall alleging that Hall had refused to comply with the judgment of December, 1853, agreeably to which Watts had fixed the boundary between the Norris tract and the Grappe, or Brooks lands, but, to the contrary, had extended his lines so as to include 61 acres belonging to Brooks, and which he (Daniels) had acquired ; and on May 20, 1870, there was judgment in favor of Daniels decreeing him to be the owner of the 61 acres indicated on Watts plat, as “extended to the right.” The judgment last above referred to was affirmed by this court in re Daniels v. Hall, 22 La. Ann. 532, wherein it was said by the court:
“Witness says Hall knew very well that the land in controversy was outside his boundaries, as fixed by Watts, the surveyor. Hall admitted that Watts had told him he was making the survey under an order of the court, and according to law, as he understood it. Hall stated he would have nothing to do with the survey; that he had a right to have Ms claim located in a different .manner than that in which Watts located it.”
Erom which it may be concluded that Watts, having made his survey in accordance with the order of court and as indicated on his plat by the parallelogram containing the 640 acres, added the other parcel of 61 acres, upon the demand of I-Ia'll; but why the survey extended back 83.36 chains, on the upper and lower lines, and took in the 98-acre tract on the rear line is not explained.
In view of a contemplated sale of the land, by the succession of Daniels, Watts appears to have been employed to plat it into lots (conformably to a then existing statute), and we find in the record what purports to be a copy of the work executed by him, of which we here reproduce so much as seems pertinent to this case; the figures near the upper lines of the lots representing the acreage, and the others the number’s of the subdivisions, called sections, and of the lots, re *555 spectively; each section containing 16 lots and the number of each being placed as nearly as practicable in the middle of the section.
Part of Hailey Watts map, agreeably to which Daniels lands were laid off into lots and sold, in 1872; Norris or Levy tract being represented by name of Levy (taken from Exhibit 12, found in the transcript):

The Watts map appears to have been recorded in December, 1871, but the sale did not take place until February, 1872. Morris Levy (plaintiff’s author in title) was present and bought lot 15 in section 10, as containing 11 acres (though the acreage is not given in the plat, from which it would seem to contain a larger acreage); lot 2 in section 14, containing 20 acres; lot 5 in section 14, containing 5 acres (appearing on the map as containing 10 ¿eres); and lot 6 in section 14, containing 22 acres — all (to quote the language of the act of sale) “according to a subdivision and map of the Grappe claim this day filed for record in recorder’s office.” A. I-I. Leonard, the warrantor herein, does not appear to have attended the sale, but (over the objection of plaintiffs’ counsel that defendants should have pleaded the titles that they intended to rely on) he was permitted to introduce, towards the close of the case, acts of sale by the succession of Daniels to Y. M. Gilmar and by Gilmar to him of lots 9 and 10, in section 10, and 1 and 3 in section 15, and an act showing the sale by F. A. Leonard to him of lots 2 and 8 in section 15, 3 in section 8, 16 in section 10, and 3 and 4 in section 14; but we fail to find that those lots were adjudicated to F. A.. Leonard.
He was also permitted to introduce, without having pleaded them, an act of sale from J. P. Flournoy to him of the vendor’s right or title to all lands in the parish of Caddowhich had belonged to Daniels and had not been sold by him or in his succession; and acts by different persons appearing as heirs of Daniels and conveying such rights to Flournoy.
In 1883, plaintiffs employed W. R. De Yoe, a surveyor, of Shreveport, to make a survey of their lands, and he returned a plat which is said to have been mislaid; and in 1885 he made another plat. Shortly before the trial of this suit (in 1917), the plat first mentioned is said to have been found, and both plats were offered in evidence — the first marked “A,” and the second “BB.”
They are both combinations of the surveys by Watts of 1853 and 1871; each of them showing the Norris (Levy) tract, surrounded, on all sides, save the river front, by the Daniels lots, as they appear on the Watts map. The plat A differs from the Watts map, in that there appears upon it, as having been roughly drawn, at some time after the plat was executed, a nameless bayou, with a loop in it, crossing the northwest corner of the *557 Norris (Levy) tract and entering Bayou Pierre to tlie westward; that corner appearing near the west bank of the nameless bayou (which is Sand Beach Bayou), and considerably to to the eastward of Bayou Pierre, the position of which remains as on the Watts map. Subjoined is a fairly correct copy of so much of plat A as concerns this case, with the exceptions hereafter noted.
Plat A offered by plaintiffs, said to have been drawn by De Voe, surveyor, for plaintiff in 1883:

*559 The following points are noted in regard to the plat as above sketched: The quoted matter, beginning with the words “Map showing plantation,” is the only matter (speaking with reference to other writing to which we will hereafter advert) which can be thought to have been placed there when the inap was drawn; and that, and the matter immediately above it, show the only instances in which the signature of De Yoe ' appears. In the matter last referred to, the word “resurvey” is written with a certain flourish at the end of the “y,” which considering the question of grammatical construction, suggests the idea that the writer intended to write "resurveyed” aiid that he made and signed the plat at some time subsequent to the year 1883. At the top of the sheet upon which the plat is drawn, there appears the following:
Started írom Cawtliorn & Levy corner A Persimmon tree B 1.
On Red River persimmon tree 15 di S. 30' E 1 C. 51 L. c. it
15 di. S. 30" E. 1Ó51 L 27.21 to timber 57.58 “ Willow Lake 71.54 “ Sand Beach Bayou 74.34 “ other’ side 83.36 " corner
There is some undecipherable pencil writing, and a waving line which we have indicated by the letters A Z.
Below, on the samé shoot and partly across the map itself, we find the following:
“Prom Levy & Cawtlion corner- So. 52% W.
27.21 to timber
5S.34 to Mulberry stake on bank of Willow Lake
71.53 to Sand Beach Bayou
“Thence, from Mulberry stake, at 58.54 ch. from corner, ran south, 52% E. on random line. At 80 chs. placed stake. At 83.37 chs. to old marked line, which accepted for property line (though in excess 3.87 chs.). Then ran north 52% E to river on old marked line.”
None of the foregoing are signed, and, as field notes of the survey, they are incomplete. The Norris (Levy) tract is colored blue.* as also are lots 15 in section, 10 and 2, 5, and 6 in section 14; and likewise a triangular parcel, which though separated by lines from lots 11 and 15, bears no number, and, if numbered, would probably bo lot 14; anotlier triangle, lying next to the Norris tract, which is neither separated from lot 15 nor numbered, and if numbered would probably be lot 16; and still another triangle bounded by lots 1 and 5 in section 15, and the Norris tract, separated from those subdivisions by lines, but bearing no number, and, if numbered, would probably be lot 4.
The writing above quoted is done rather roughly in ink of a different color from the body of the plat, as is also the loop of the bayou passing across the northwest corner of the Norris (Levy) tract.
In regard to that, it is conceded that Sand Beach bayou is thereabouts, and, though it has no loop at this time, no one undertakes to say that there was not such a loop in 1883 and 18S5. The plat BB appears to have been drawn originally in red ink, upon brown wrapping paper, almost thick enough to be called pasteboard, and is so broken by being folded as to be, in places, undecipherable. Counsel think it boars date 18S5, but we fail to find the “5”; that date is, however, testified to by one of the plaintiffs. The only-writing' that is signed by the surveyor reads as follows:
“Sketch showing lands belonging M. Levy, Esq., situated in secs. 10, 11, 14 and 15 in T. 16 N., R. 13 W. Platted Feb. 28th, 1S8(5?)
“By Wm. R. De Voe.”
According to the red ink[1] entries, the upper, lower, and back lines of the Norris (Levy) tract bear the same figures as on the plat A, and the northwest comer of the tract is likewise placed to the eastward of Bayou Pierre and between that bayou and the “loop” (which reappears) of Sand Beach bayou. The plat (or “sketch”)' bears a number of inscriptions, roughly made, in black ink, which *561 are attributed to the surveyor. One or two witnesses who were associated with him and wore familiar with his writing expressed doubts upon that subject. Among others is, a notation indicating the discovery of an “ironwood tree,” on' the lower line of the tract at a distance, it is said, of 1,321 feet from the southwest comer; and also the figure “(2)” at the southwest corner identified with the following:
(2) Sweet gum 14” di N 19 E 27 L
“ “ 12 “ S 19 W. 12 L
“ “ 30 “ N 51 E 30 L
Another such notation consists of the figures “1526,” at the point where the upper line of the tract strikes the east bank of the loop of Sand Beach bayou.
The map annexed to the petition herein, according to which plaintiffs make their claim (reduced to about one-fourth the size as it appears in the original) is, in general outline, as follows:

There appears upon the above map the following note of the surveyor, author of the map, called as a witness for plaintiffs, to wit:
“A” Pound 3 'st. gum witness trees referred to by De Voe as H. Wollf’s survey, as follows :
Sweet gum 14" Día N 19 E 27 L
“ “ 12" “ S 19 W 12 L
“ “ 30" “ N51W30L
Actually N 71° W ,
“B” Pound ironwood “tree,” referred to by Wm. R. De Voe as Wollf’s survey.
We are unable to find any reference by De Voe to “Wollf’s survey,” but may have overlooked it.
Mr. Wilson,' a surveyor and civil engineer who has been acquainted with the land in question for many years, and in 1888 staked out the state levee, then constructed in front of it, prepared a map from an actual survey, made during the trial, which shows De Voe’s “mulberry stake” at 58.54 chains from the Levy and Cawthorn corner; the east bank of Sand Beach bayou at 71.54 chains; the “other side” at 74.34 chains; the northwest corner of the tract at 83.36 chains, in a cornfield, between Sand Beach bayou and Bayou Pierre; and the corner that plaintiffs are insisting upon, on the west bank of Bayou Pierre, 690 feet further along.
The existence of Sand Beach bayou, as mentioned by De Voe, is undisputed; and it seems inconceivable that he should have mentioned reaching one side of that bayou, then the “other side,” then the “corner” at 83.36 chains, without mentioning Bayou Pierre, if he had crossed it, the more particularly as on both the maps A and BB the two bayous are designated; the name of Sand Beach bayou being mentioned in the field notes, that of Bayou Pierre being plainly lettered on that stream, as designated on the map, and the northwest corner of the tract being established at a point between the two streams, in what, at the time of the trial, was found to be a cornfield, scaling over 1,200 feet in width.. . ... •
*563 Opinion.
Acting under the order of court, Watts, in 1854, made the survey of the Norris tract— beginning at the southeast corner, on the river. Following the bends of the river, his course foots up over 105 chains, which are said to be about the equivalent of 80 chains in a straight course. From the corner thus reached, he ran east 52% degrees west 83.36 chains to a corner; that is to say, 3.36 chains beyond the distance required to give Norris a parallelogram .containing 040 acres. He then ran south 52% degrees east 80 chains to the southwest corner of the tract; and thence north 52% degrees, 83.36 chains, to the place of beginning. Some 17 years later (in 1871), he was called on to lay off the Daniels lands (which surrounded the Norris tract on all sides except the river) into lots of 40 acres, or approximately 40 acres each ; and no one could have been better qualified for that work, since, having established the lines of the Norris tract, he must have known where to find them, and he appears to have found and used them. His map showing the lines of the Daniels lots and the Norris tract in their relations to each other, was duly recorded. The lots were offered for sale, and Levy, who had become the owner of the Norris tract, bought certain lots according to that map, which indicated their acreage (whether correctly or incorrectly) and showed that they were bounded on one side by the Norris tract. One of the lots (No. 15 of section 10) lies just outside of the northwest corner of the Norris tract; in fact, the tract seems to corner on, or just above, the line between lots 15 and 10 in section 10, and, distinctly, to the eastward of Bayou Pierre. Lots 5 and 6 in section 14 (also bought by Levy) lie upon either side of the southwest corner of the tract, which corners upon the. line between them, and lot 2 of that section (included in the purchase) borders the lower line of the tract. Those facts are obvious, not only from the map according to which the lots were sold, but according to the surveys and plats A and BB executed by De Voe, at the instance of the Levy heir in charge of the estate, some 13 and 15 years later (in 1883 and 1885). Following these surveys was an interval of over 30 years during which peace reigned in the settlement- and titles changed owners; and, at the end of that period (in 1916), plaintiffs brought this suit, which is based upon the assertion that the back line of their Norris, tract should be set further back 800 feet, or more, so as to take in property which does not appear, by any of the surveys, to have been heretofore included therein; and one of the arguments in support of that assertion is that, beginning at the back line, as designated on the plats of survey, and running to the river, it would now be necessary to go into the river, or even across it, in order to find their 640 acres. But the evidence abundantly shows that their river front was, for years, a caving-bank, and that the batture upon the other bank has been growing. The present levee is probably 1,200 feet behind the levee that Wilson staked out in 1SSS or 1S89, .and there is some expression of opinion -'to the effect that the caving at the end of the-upper line of the tract has encroached to a depth of 1,800 feet. However that may be, the fact remains that Watts surveyed the Norris tract in 1854, and gave Norris a depth of 5,501 feet, or 221 feet more,; apparently, than he was entitled to, by his full width with the course of the river, and that the rear and upper corner of the tract so surveyed is to be found, today, just where he placed it, and has been found on two occasions by a surveryor employed by plaintiffs more than 30 years ago for no other purpose; and, that being true, it is immaterial, for the purposes of this case, whether plaintiffs now find their original holdings on the one side of Red river, or *565 the other, or in the middle of that stream. It is quite true that plaintiffs have called two surveyors and civil engineers who say many things about the location of the line in question, and that defendants have called two other surveyors and engineers who' say many other things on the same subject; that their testimony is irreconcilably conflicting and fills hundreds of pages of the transcript; and that their conflicting plats, maps, sketches, blueprints, etc., are very numerous; but neither of plaintiffs’ witnesses shows, or pretends to show, that Watts or De Voe or any other surveyor has ever run the northwest line of the Norris tract to the west bank of Bayou Pierre, or ever attempted it, until the attempt by plaintiffs’ witnesses for the purposes of this case; and that attempt, we think, is not sustained by the facts.
Plaintiffs have brought a petitory action; the burden rests upon them to establish the title which they set up; they have failed so to do; and—
It is therefore ordered that the judgment appealed from be annulled; that plaintiffs’ demands, as also the demands in warranty and in reconvention, be rejected, and that this suit be dismissed at plaintiffs’ cost in both courts.

 Color not sliown on plat prepared for publication.